IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

Ronald Gordon Young,        )    Civil Action No. 8:16-cv-00986-PMD-JDA
                           )
          Plaintiff,    )
                           )
      vs.             )    __**REPORT AND RECOMMENDATION**__
                           )    __**OF MAGISTRATE JUDGE**__
Nancy A. Berryhill,        )
Acting Commissioner of Social Security, )
                           )
        Defendant.   )

     This matter is before the Court for a Report and Recommendation pursuant to Local Civil Rule 73.02(B)(2)(a), D.S.C., and 28 U.S.C. § 636(b)(1)(B).[1]  Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claim for social security insurance benefits.[2]  For the reasons set forth below, it is recommended that the decision of the Commissioner be reversed and remanded for administrative action consistent with this recommendation, pursuant to sentence four of 42 U.S.C. § 405(g).

## PROCEDURAL HISTORY

     On June 15, 2010, Plaintiff filed an application for supplemental security income benefits ("SSI"), alleging an onset of disability date of October 1, 1998, subsequently

---

   [1] A Report and Recommendation is being filed in this case, in which one or both parties declined to consent to disposition by a magistrate judge.

   [2] Plaintiff's earning record shows that he acquired sufficient coverage to remain insured through December 31, 2003.  Because Plaintiff amended his alleged onset date to June 1, 2010, he effectively withdrew his request for Title II benefits. [*See* R. 17.]

1

amended to June 1, 2010. [R. 268–71.] The claim was denied initially and upon reconsideration. [R. 92–95]. Thereafter, Plaintiff filed a written request for hearing and, on April 18, 2013, testified at a hearing before Administrative Law Judge ("ALJ") Stanley K. Chin. [R. 31–52.]

The ALJ issued a decision on May 24, 2013, finding Plaintiff not disabled under the Social Security Act ("the Act"). [R. 98–113.] In this initial decision, the ALJ found Plaintiff capable of performing light work with the exception of frequent climbing, balancing, stooping, kneeling, crouching and crawling; and with the need to avoid concentrated exposure to extreme cold and heat. [R. 105.] On June 24, 2013, Plaintiff requested Appeals Council review [R. 196–97], and on October 25, 2013, the Appeals Council remanded the matter back to an ALJ directing the ALJ to update the evidence on Plaintiff's medication condition consistent with the guidelines; to give further consideration to Plaintiff's maximum RFC during the entire period at issue and to provide rationale with specific references to the evidence of record in support of the assessed limitations; and to obtain supplemental evidence from a vocational expert, if warranted, to clarify the effects of the assessed limitations on Plaintiff's occupational base [see R. 114–117].

On August 25, 2014, Plaintiff testified before a different ALJ, Wendell M. Sims. [R. 53-91.] The ALJ issued an opinion on November 4, 2014, finding Plaintiff not disabled under the Act. [R. 14–30.] At Step 1,[3] the ALJ found Plaintiff last met the insured status requirements of the Act on December 31, 2003, and had not engaged in substantial gainful activity since the amended alleged onset date of June 1, 2010. [R. 19, Findings 1 & 2.]

---

[3]The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

At Step 2, the ALJ found Plaintiff had severe impairments of ankylosing spondylitis and ulcerative colitis.  [R. 19, Finding 3.] The ALJ also noted that Plaintiff had non-severe impairments of anxiety, depression, attention deficit hyperactivity, and chest pain. [R. 20.] At Step 3, the ALJ found Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  [R. 20, Finding 4.]

Before addressing Step 4, Plaintiff's ability to perform his past relevant work, the ALJ assessed Plaintiff's residual functional capacity ("RFC") and found as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: he can frequently climb, balance, stoop, kneel, crouch, and crawl and must avoid concentrated exposure to extreme cold and extreme heat.

[R. 20, Finding 5.]  Based on this RFC, the ALJ determined at Step 4 that Plaintiff was capable of performing his past relevant work as a purchasing director/warehouse supervisor. [R. 22,  Finding 6.]  Alternatively, based Plaintiff's age, education, work experience, RFC, and the testimony of a vocational expert, the ALJ determined that there were other jobs that existed in significant numbers in the national economy that Plaintiff could perform. [R. 23, Finding 6.]  Accordingly, the ALJ concluded Plaintiff had not been under a disability, as defined in the Act, from June 1, 2010, the amended onset date, through the date of the decision.  [R. 24, Finding 7.]

Plaintiff requested Appeals Council review of the ALJ's decision, and on January 27, 2016, the Appeals Council declined.  [R. 1–6.] The Appeals Council considered certain additional evidence, including a "medical report from Pasquale Barratta, M.D., dated

September 17, 2014." [R. 5.]  Plaintiff filed the instant action for judicial review on March 29, 2016.  [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends that errors by the ALJ require the decision to be remanded for further administrative proceedings.  [*See* Doc. 16.]  Specifically, Plaintiff alleges the ALJ failed to properly assess medical opinion evidence from Plaintiff's treating physician, Dr. Pasquale D. Baratta, M.D. ("Dr. Baratta") [*id*. at 20–31]; failed to provide a meaningful assessment of Plaintiff's credibility in accordance with SSR 96-7p [*id*. at 31–35]; and failed to properly explain his findings regarding Plaintiff's RFC, in light of his alleged limitations, in accordance with SSR 96-8p [*id*. at 35–38].

The Commissioner contends the decision is supported by substantial evidence and should be affirmed. [Doc. 17.] Specifically, the Commissioner argues that the ALJ followed controlling regulations in evaluating Dr. Baratta's opinions [*id*. at 5–8]; reasonably found Plaintiff's subjective complaints were inconsistent with the evidence [*id*. at 9–10]; and sufficiently explained the basis for his assessment of Plaintiff's work capacity [*id*. at 10–11].

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687

4

(S.D.W. Va. 1963)) ("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court.  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *See Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012); *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the

courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)). Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision). To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled). Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four is usually the proper course to allow the Commissioner to explain the basis for the decision or for additional investigation. *See Radford v. Comm'r*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985);*see also Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor

the Appeals Council indicated the weight given to relevant evidence).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand.").  After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction.  *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

      In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g).  A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court.  *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of*

*Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[4]  With remand under sentence

six, the parties must return to the court after remand to file modified findings of fact.

*Melkonyan*, 501 U.S. at 98.  The reviewing court retains jurisdiction pending remand and

does not enter a final judgment until after the completion of remand proceedings.  *See*

*Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an

order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C.

§ 405(g) is not a final order).

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured

for benefits, who are not of retirement age, who properly apply, and who are under a

disability.  42 U.S.C. § 423(a).  "Disability" is defined as:

> the inability to engage in any substantial gainful activity by
> reason of any medically determinable physical or mental
> impairment which can be expected to result in death or which
> has lasted or can be expected to last for a continuous period
> of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.    The Five Step Evaluation

---

[4]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth
in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the
Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating
a claim for remand based on new evidence.  *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152,
2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107,
2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No.
2:08-cv-93, 2009 WL 86734, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health &
Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992).  Further, the Supreme
Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect.
*See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990).  Accordingly, the Court will apply
the more stringent *Borders* inquiry.

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims). The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment. 20 C.F.R. § 416.920. Through the fourth step, the burden of production and proof is on the claimant. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). The claimant must prove disability on or before the last day of her insured status to receive disability benefits. *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969). If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. § 416.920(a)(4); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

## A.  *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. § 416.972(a)—and gainful—done for pay or profit,

whether or not a profit is realized, *id.* § 416.972(b).  If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity.  *Id.* § 416.974–.975.

### B.    *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  *See id.* § 416.921.  When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments.  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).  The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses.  *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them").  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments.").  If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process."  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

### C.    *Meets or Equals an Impairment Listed in the Listings of Impairments*

If a claimant's impairment or combination of impairments meets or medically equals

the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. § 416.909, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience.[5]    20 C.F.R. § 416.920(a)(4)(iii), (d).

### D.    *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant." *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995).  At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[6] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work.  20 C.F.R. § 416.960(b).

### E.    *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *See* 20 C.F.R. § 416.920(f)–(g); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).   To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids").   Exclusive reliance on the "grids" is appropriate where the claimant suffers

---

[5]The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. §§ 416.911, 416.925.

[6]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations."  20 C.F.R. § 416.945(a)(1).

primarily from an exertional impairment, without significant nonexertional factors.[7]  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e);  *Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations).  When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931.  In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work.  20 C.F.R. § 416.969a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy.").  The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform."  *Walker*, 889 F.2d at 50.  For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Id.* (citations omitted).

---

[7]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs.  20 C.F.R. § 416.969a(a).  A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands. *Id.* Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing.  § 416.969a(c)(1).

12

## II.     Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is required to inquire fully into each relevant issue.  *Snyder*, 307 F.2d at 520.  The performance of this duty is particularly important when a claimant appears without counsel.  *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980).  In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Id.* (internal quotations and citations omitted).

## III.     Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight.  20 C.F.R. § 416.927(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the

13

opinion, 20 C.F.R. § 416.927(c).  Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. § 416.927(c)(2).  An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways.  *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986).  Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  20 C.F.R. § 416.927(d).  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also Conley v.*

*Bowen*, 781 F.2d 143, 146 (8th Cir. 1986). The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability. 20 C.F.R. § 416.917. Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. *Id.*

## V.    Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis. *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion). First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'" *Id.* (quoting *Craig*, 76 F.3d at 594). Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain." *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re

not supported fully by objective observable signs." *Coffman v. Bowen*, 829 F.2d 514, 518

(4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)). The ALJ

must consider all of a claimant's statements about his symptoms, including pain, and

determine the extent to which the symptoms can reasonably be accepted as consistent

with the objective medical evidence. 20 C.F.R. § 416.928. Indeed, the Fourth Circuit has

rejected a rule which would require the claimant to demonstrate objective evidence of the

pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the

Commissioner to promulgate and distribute to all administrative law judges within the circuit

a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v.*

*Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990). The Commissioner thereafter issued the

following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth
> Circuit (North Carolina, South Carolina, Maryland, Virginia and
> West Virginia), Social Security Ruling (SSR) 88-13, Titles II
> and XVI: Evaluation of Pain and Other Symptoms:
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying
> physical or [m]ental impairment that could reasonably be
> expected to cause pain is shown by medically acceptable
> objective evidence, such as clinical or laboratory diagnostic
> techniques, the adjudicator must evaluate the disabling effects
> of a disability claimant's pain, even though its intensity or
> severity is shown only by subjective evidence. If an underlying
> impairment capable of causing pain is shown, subjective
> evidence of the pain, its intensity or degree can, by itself,
> support a finding of disability. Objective medical evidence of
> pain, its intensity or degree (i.e., manifestations of the
> functional effects of pain such as deteriorating nerve or muscle
> tissue, muscle spasm, or sensory or motor disruption), if
> available, should be obtained and considered. Because pain
> is not readily susceptible of objective proof, however, the
> absence of objective medical evidence of the intensity,

severity, degree or functional effect of pain is not determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990). SSR 90-1p has since been superseded by SSR 96-7p, which is consistent with SSR 90-1p. *See* SSR 96-7p, 61 Fed. Reg. 34,483-01 (July 2, 1996). SSR 96-7p provides, "If an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms." *Id.* at 34,485; *see also* 20 C.F.R. § 416.929(c)(1)–(c)(2) (outlining evaluation of pain).

## VI.   Credibility

The ALJ must make a credibility determination based upon all the evidence in the record. Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria. *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor. But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

**Brief Summary of Relevant Medical History**

17

On March 11, 2010, Plaintiff underwent an x-ray of the cervical spine which showed intact vertebrae, normal alignment, mild decreased disc height and mild spondylosis at C6-7 and C7-T1. [R. 425.] The x-ray also showed mild mid & lower thoracic facet joint osteoarthrisits of the lumbar spine, mild lateral spondylosis at T12-L1, slightly decreased disc spaces at L4-5, and normal sacroilic joints. [*Id.*]

On August 29, 2010, Plaintiff was hospitalized after presenting with abdominal pain and fever which had persisted for about three weeks. [R. 393.] Plaintiff was also experiencing some diarrhea which was bloody. [*Id.*] A CT of Plaintiff's abdomen showed diffused bowel wall thickening in the sigmoid colon and congestive with prominent lymph nodes, most likely secondary to infectious colitis. [*Id.*] A colonoscopy performed during a GI evaluation after admittance showed chronic active ulcerations suggestive of ulcerative colitis. [*Id.*]

Plaintiff reported that, in June 2010, he noticed blood streaking in his stool. [R. 409.] A CT scan and labs revealed colon inflammation and he was treated with Cipro for ten (10) days. [*Id.*] Plaintiff's symptoms improved and, towards the end of June, had completely resolved. [*Id.*]

In early August, Plaintiff reported that he developed diarrhea with 4-5 bloody bowel movements per day and mild crampy abdominal pain. [*Id.*] Plaintiff thought the symptoms would resolve but they ultimately got to the point that the frequency of his bowel movements increased to 10–20 a day with more abdominal pain and some fever or chills. [*Id.*] Plaintiff reported he lost about 10 pounds over the last three weeks. [*Id.*] Plaintiff was discharged on September 3, 2010, with prescriptions for acetaminophen-propoxyphen, ciprofloxacin, dicyclomine, lactobacillus acidophilus, loperamide, mesalamine,

metronidazole, and prednisone.  [R. 394.]

In September 2010, Plaintiff moved from California to Charlotte to live with his mother as his disability benefits, which he was receiving in California, ran out. [R. 459.] Plaintiff was seen at Choice Care Family Medical Center and reported having difficulty getting out of bed about one-third of the days and having joint stiffness and pain.  [*Id.*] He also reported being more anxious and depressed because of his situation.  [*Id.*] Plaintiff was assessed with ulcerative colitis, ankylosing spondylitis, and anxiety/depression/insomnia secondary to the above circumstances.  [*Id.*]

On October 12, 2010, Plaintiff was admitted to the hospital by Dr. Prashanth Kamath ("Dr. Kamath").  [R. 429, 443.]  Plaintiff was admitted after failing to thrive on outpatient prednisone and Asacol.  [R. 429.] Plaintiff had resorted to eating oatmeal and baby food due to postpardial pain, and had lost 15 to 18 pounds, all while on 40 mg a day of prednisone.  [R. 443.]  Plaintiff also continued to have about 8-10 bowel movements, especially at night. [R. 435.]  A colonoscopy performed on October 15, 2010, to the ascending colon was terminated due to difficulty passing the scope.  [R. 429–30, 449.] Withdrawal of the scope revealed severe pan ulcerative colitis with diffuse confluent ulcerations, mucus and blood.  [R. 430.]  Plaintiff was transitioned to prednisone 60 mg for a week.  [*Id.*]  He was discharged on October 15, 2010.  [*Id.*]   Treatment notes indicated Plaintiff had become depressed and was experiencing untoward side effects with oral prednisone.  [R. 436.]  Additionally, Plaintiff had lost insurance coverage and was experiencing financial stress.  [R. 444.]

On October 19, 2010, Plaintiff presented to Dr. Dennis Kokenes ("Dr. Kokenes") with Charlotte Gastroenterology & Hepatology, P.L.L.C., on follow up after his hospital stay.  [R.

445.] Plaintiff reported having 8–10 stools per day but without blood or pain. [*Id.*] He reported eating better but not having a good appetite. Plaintiff was assessed with moderate to severe ulcerative colitis responding to IV Sol-Medrol and oral prednisone but without complete remissions at this time. [R. 446.] Dr. Kokenes also noted possible colonization with clostridium difficile given Plaintiff's hospitalizations. [*Id.*]

On October 25, 2010, Plaintiff returned to Choice Care Family Medical Center on follow up after being hospitalized weeks prior for another flare-up of ulcerative colitis. [R. 458.] Plaintiff reported drinking protein shakes to try to gain weight, having trouble sleeping and having heartburn from the prednisone. [*Id.*]

On November 2, 2010, Plaintiff saw Dr. Kokenes again for an EGD with biopsy for the evaluation of chest pain. [R. 447.] Endoscopic impressions revealed severe confluent esophagitis with erythema and superficial exudate involving the lower 2/3 of the esophagus. [*Id.*]

On January 20, 2011, Dr. Baratta saw Plaintiff for medical follow up and for lab work and reported that his ulcerative colitis had been under control for the previous two months. [R. 500.] He also reported that Paxil seemed to be helping his anxiety and depression, but he was still having trouble staying asleep at night and did not feel rested during the day. [*Id.*] Treatment notes indicated that Plaintiff's ulcerative colitis with ankylosing spondylitis was "fairly stable" at the time and that he needed better help with sleep. [*Id.*]

On February 14, 2011, Plaintiff was seen at Charlotte Gastroenterology & Hepatology to discuss treatment plans. [R. 632.] Plaintiff reported having regular bowel movements, occasionally loose, sometimes foul/odorous, but no blood or mucus or abdominal pain, unexplained weight loss, heartburn or dysphagia. [*Id.*] Plaintiff was

20

assessed with ulcerative colitis in remission on 6-mercaptopurine and Asacol.  [R. 633.]

On February 24, 2011, Lisa Clausen, PhD., ("Dr. Clausen") completed a Psychiatric Review Technique with respect to Plaintiff's mental limitations and found them to be not severe.  [R. 473.]  Dr. Clausen found Plaintiff had no restrictions in his activities of daily living; mild difficulties in social functioning and in maintaining concentration, persistence or pace; and no episodes of decompensation.  [R. 483.]

A Physicial RFC was completed by Dr. William Hopkins ("Dr. Hopkins") on March 7, 2011, finding Plaintiff capable of the following: occasionally lifting/carrying 50 pounds; frequently lifting/carrying 25 pounds; standing/walking/sitting 6 hours in an 8-hour day; and unlimited pushing/pulling except as shown for lifting/carrying.  [R. 488.]  Dr. Hopkins noted no postural, manipulative, visual or communicative limitations.  [R. 489–91.]  Dr. Hopkins did note, however, that Plaintiff should avoid concentrated exposure to extreme cold and heat.  [R. 491.]

On August 3, 2011, Plaintiff was seen by Dr. Baratta for medical follow-up and blood work and reported that his bowels had been good and that he was in no pain with no bleeding. [R. 499.]  He did report, however, that he was still feeling weak and tired and wanted to be checked for low testosterone.  [*Id*.] Treatment notes indicated that Plaintiff's ulcerative colitis with ankylosing spondylitis, as well as his anxiety, depression and insomnia, were all stable on his current therapy.  [*Id*.]

On November 10, 2011, Plaintiff returned to Dr. Baratta for medical follow-up and testosterone injections stating that he was having some arthritic pain in his right shoulder and hands which was worse at night.  [R. 498.]  He also reported that his heel and foot pain had improved with new sneakers and that his anxiety was under control with Paxil and

Klonopin. [*Id*.] Plaintiff indicated that his bowels had been relatively good with no episodes of lower GI bleeding. [*Id*.] Plaintiff's anxiety, depression, insomnia and ulcerative colitis with ankylosing spondylitis were all deemed stable on current therapy. [*Id*.]

Plaintiff was seen by Dr. Baratta on May 21, 2012, for a medical follow up and lab work and reported that he still gets anxious and depressed but that Xanax and Paxil seemed to help. [R. 497.] Plaintiff also reported he was still having migrating arthritic pains in his left shoulder, left hip and right foot, but was not having any GI flare-ups of colitis at the time. [*Id*.]

Dr. Baratta's treatment notes dated July 11, 2012, reflected that Plaintiff was feeling better mentally, was sleeping better, and was able to concentrate and focus better. [R. 496.] He was still, however, having scattered arthralgias in his knees, ankles and throughout his upper and lower back. [*Id*.] Plaintiff had not had any significant bouts with abdominal pain or bloody bowel movements. [*Id.*]

Dr. Baratta's treatment notes dated November 12, 2012, indicated that Plaintiff was not having any GI complaints; his anxiety/depression/ADHD were stable on current therapy; and that his subclinical hypothyroidism, hyperlipidemia, hypogonadism and iron deficiency anemia were stable. [R. 495.] The notes also indicated that Plaintiff's history of ulcerative colitis and ankylosing spondylitis was stable on current therapy. [*Id*.]

On February 23, 2013, Plaintiff was admitted to Carolinas Medical Center Pineville to rule out myocardial infarction after an episode of chest pain the night before. [R. 586.] Plaintiff had no reoccurrence of chest pain and was discharged and recommended for outpatient stress testing and follow up. [*Id*.] The treating physician noted that there was a significant anxiety component to Plaintiff's symptoms. [R. 587.]

On May 3, 2013, Plaintiff was admitted to Carolinas Medical Center Pineville after experiencing four hours of chest discomfort. [R. 516.] Cardiac enzymes were negative for myocardial infarction and there was no acute ischemia on his EKG. [*Id*.] A cardiac catherization from a right radial artery approach revealed completely smooth, normal coronary arteries and normal left ventricle function with an EF of 60%. [*Id*.] Plaintiff was discharged but advised to follow up with his primary physician, Dr. Baratta, and recommended evaluation for non-cardiac causes. [*Id*.]

On May 8, 2013, Dr. Baratta completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) on behalf of Plaintiff. [R. 518–23.] Dr. Baratta opined that Plaintiff could:

* lift/carry up to 10 pounds occasionally but never over 11 pounds due to his ankylosing spondylitis; ulcerative colitis; point tenderness through cervical and upper thoracic spine and under right scapula and along lumbar spine; diffuse mild muscle weakness in hands/feet (4/5); intermittent edema, and pain in the hands, ankles and feet; and slight positive Rhomberg test.

* frequently reach, handle, finger, and feel; and occasionally push/pull with both his left (dominant) and right hands.

* occasionally operate foot controls with both his left and right feet.

* sit/stand for 1 hour and walk for 20 minutes without interruption; and sit/stand for 2 hours and walk for 1 hour total in an 8-hour work day, with the remainder of the time requiring Plaintiff to lie down and rest. The doctor based these limitations on Plaintiff's persistent diarrhea with occasional bleeding from ulcerative colitis, and his chronic anxiety and depression related to his medical issues.

* occasionally climb stairs/ramps, balance, stoop, and kneel; but never climb ladders or scaffolds, crouch or crawl due to his slightly positive Rhomberg test.

* occasionally tolerate exposure to moving mechanical parts; operating a motor vehicle; humidity and wetness; dust, odors, fumes and pulmonary irritants; extreme cold; extreme heat; and vibrations; frequently tolerate loud

(heavy traffic); but never tolerate exposure to unprotected heights.

\* shop; travel with a companion for assistance; ambulate without assistance; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace using a hand rail; prepare a simple meal and feed himself; care for his personal hygiene; and sort, handle or use paper/files.

[R. 518–23.]  The form indicated that these limitations are assumed to be current limitations unless the doctor indicated a date when the limitations were first present; Dr. Baratta provided no date. [R. 523.] Dr. Baratta did, however, indicate the limitations would last for 12 consecutive months.  [*Id*.]

On June 14, 2013, Plaintiff returned to Dr. Baratta on follow up reporting that he had not had any further severe gallbladder attacks since his ER visit.  [R. 650.] He reported still having several episodes of loose bowel movements that day requiring him to run to the bathroom frequently.  [*Id.*]  Dr. Baratta assessed Plaintiff with anxiety/depression/ADHD which were fairly stable on his current regimen; a history of ulcerative colitis and ankylosing spondylitis which remained fairly symptomatic at times; and cholelithiasis with a history of cholecystitis. [*Id.*] Dr. Baratta discussed with Plaintiff getting a surgical consultation for his gallstones, but he could not afford the consultation at the moment.  [*Id.*]

On August 20, 2013, Plaintiff presented to the emergency department at Carolinas Medical Center Pineville, complaining of abdominal pain with nausea over the previous 12 hours.  [R. 525.]  Plaintiff described the pain as sharp (9/10), in the upper right quadrant radiating to the back.  [*Id.*]  Plaintiff was diagnosed with biliary colic and abdominal pain; was discharged with Lortab and Zofran; and was given recommended follow up and return precautions.  [R. 526.]  On August 21, 2013, Plaintiff re-presented to the emergency department with worsening upper right quadrant abdominal pain consistent with

24

cholelithiasis and early acute cholecystitis.  [R. 536.]  Plaintiff was taken to surgery, gall stones (too many to count) were removed, and, on August 22, 2013, he was discharged. [*Id.*]

On September 4, 2013, Plaintiff returned to Dr. Baratta on follow after his laparoscopic cholecystectomy two weeks prior.  [R. 649.]  Plaintiff indicated he was sleeping better taking half a Ritalin tablet a day and was not having problems with his other meds.  [*Id.*]  Dr. Baratta noted Plaintiff's anxiety/depression/ADHD were stable on his current regimen; he was doing well post cholecystectomy; and his ulcerative colitis and ankylosing spondylitis were stable on current therapy.  [*Id.*]

On September 18, 2013, Plaintiff presented to Surgical Specialists of Charlotte on follow up from his laperoscopic cholecystectomy on August 22, 2013.  [R. 612.] Plaintiff denied any abdominal pain, drainage or erythema from his wound site; denied fevers or chills, chest pain or shortness of breath; and noted that his bowel movements had returned to "normal for him."  [*Id.*]

On December 10, 2013, Plaintiff returned to Dr. Baratta on follow up after falling due to, he believed, a brief syncopal expisode.  [R.  649.]  Plaintiff reported he may have been slightly dehydrated from recent bouts of diarrhea, and indicated that he still had occasional bouts of colitis which lasted up to three days, but with no associated bleeding or fever.  [*Id.*] Plaintiff reported having occasional pain in his left hip which was worse with sitting and better when lying down.  [*Id.*]  Dr. Baratta continued Plaintiff on his current meds and supplements with exercise as tolerated.  He assessed his anxiety/depression and ADHD as stable on current meds; and his history of colitis and ankylosing spondylitis, post cholecystectomy, as stable.

25

On January 6, 2014, Plaintiff returned to Dr. Baratta complaining of having dark color to his urine, aching epigastric pain which had been fairly consistent, and a greenish color to his stool.   [R. 648.] Plaintiff was assessed with epigastric pain and hyperbilirubinuria–rule out underlying hepatobiliary etiology versus secondary to medication.  [*Id.*]  Plaintiff was seen by Dr. Kokenes for further evaluation that day which revealed intrahepatic obstructing stones.  [*Id.*] Plaintiff was referred for surgical evaluation. [*Id.*]

On January 7, 2014, Plaintiff was seen by Dr. Eric Stone ("Dr. Stone") of Charlotte Gastroenterology & Hepatology due to an abnormal GI study.  [R. 629.]  Plaintiff described mostly regular bowel movements with only occasional bouts of diarrhea; no bleeding, abdominal pain or unintentional weight loss; and no other symptoms of active ulcerative colitis.  [*Id.*] Dr. Stone noted that the last time he saw Plaintiff in 2011, he was in remission on 6-mercaptopurine and Asacol.  [*Id.*]  Dr. Stone noted that Plaintiff had episodes of back and chest pain in the fall of 2013 which, after having stones removed from his gallbladder, did not reoccur.  [*Id.*]  Between Christmas 2013 and New Year's 2014, Plaintiff developed epigastric pain after eating some pie.  [*Id.*]  Dr. Stone determined Plaintiff's symptoms were suggestive of common bile duct stone or sludge.  [R. 630.]  Dr. Stone suggested doing an ERCP on January 10, 2014, to evaluate Plaintiff for common bile duct stones and sphincterotomy and clearance of the bile duct stones or debris given Plaintiff's clinical presentation.  [*Id.*]

On January 21, 2014, Plaintiff was seen by Dr. Baratta on follow up after his ERCP. [R. 648.]  Plaintiff reported that, overall, is urine was back to normal, although slightly darker in the mornings; he was not having abdominal pain but continued to feel fatigued;

and he denied any nausea, vomiting, diarrhea or urinary complaints.  [*Id.*]

On January 24, 2014, Plaintiff was seen by Dr. Kokenes on referral from Dr. Baratta, on follow up after the ERCP on January 10, 2014,  at which time a small stone was removed, ultimately relieving Plaintiff's epigastric pain and jaundice.  [R. 625, 627–28.] Plaintiff was also being checked due to abnormal liver test results.  [*Id.*]  Dr. Kokenes concluded that Plaintiff's abnormal liver test results were more consistent with hepatic inflammation probably from a combination of medications and general anesthesia; and that his abnormal results, consistent with biliary obstruction, were normalizing since the stone removal.  [R. 626.]

On March 13, 2014, Plaintiff saw Dr. Baratta on follow up and for review of lab work. [R. 647.]  He reported having watery bowel movements for the past two days but denied abdominal pain or bleeding.  [*Id.*]  Plaintiff also reported getting migrating poly arthritis which involved his hips, back and shoulders, with his hip pain being worse at the time.  [*Id.*] Plaintiff also reported feeling slightly more depressed over the last three weeks with lack of motivation, however, he had not been using his Ritalin recently.  [*Id.*]  Plaintiff was assessed with hyperlipidemia, noting he needs to get back on track; history of ulcerative colitis and ankylosing spondylitis which was still symptomatic at times; and anxiety/depression/ADHD which may improve from reinstituting Ritalin.  [*Id.*]

Treatment notes indicated Plaintiff saw Dr. Baratta on June 12, 2014, on follow up with complaints of pain in his left hip and shoulder which are worse at night.  [R. 646.] Plaintiff indicated he was still having some loose bowel movements but denied any severe pain or bloody stools.  [*Id.*] Plaintiff reported no problem with his meds and that a combination of Paxil, Klonopin, Xanax and low dose Ritalin seem to keep him under

27

control. [*Id.*]  Dr. Baratta noted that Plaintiff's history of ulcerative colitis and ankylosing spondylitis were fairly stable on his current therapy; and that his anxiety/depression/ADHD were stable on his current regimen. [*Id.*]

On July 23, 2014, Dr. Baratta completed a physical RFC questionnaire on Plaintiff's behalf finding as follows:

* She has seen Plaintiff every three months for the past four years.

* Plaintiff is diagnosed with ankylosing spondylitis, ulcerative colitis, anxiety and depression; and his prognosis is guarded.

* Plaintiff's symptoms include neck/upper back pain; low back pain; weakness in hands and feet; fatigue, depressed and anxious; persistent diarrhea; occasional lower GI bleed.

* Plaintiff's pain is stabbing pain in the neck, upper back, lower spine, and feet; is relatively constant, and moderate to severe at times; and is worse with movement.

* Objective clinical findings include point tenderness and spasms in the cervical/upper thoracic spine; under the right scapula and along the lumbar spine; and mild muscle weakness in the hands and feet.

* Plaintiff takes 6-MP 50 mg for colitis which is currently in remission; he can not take NSAID's or narcotics.

* Plaintiff's impairments can be expected to last at least twelve months.

* Emotional factors contribute to the severity of Plaintiff's symptoms and functional limitations, including depression and anxiety.

* Plaintiff's pain and symptoms are severe enough to *frequently* interfere with his attention and concentration needed to perform even simple tasks.

* Plaintiff is incapable of tolerating even "low stress" jobs because stress aggravates his pain and anxiety.

* Plaintiff can walk 2 city blocks without rest or severe pain.

* Plaintiff can sit/stand 1 hour at a time before needing to get up, sit down or walk around.

28

\*        Plaintiff can sit/stand/walk less than two hours in an 8-hour work day with normal breaks.

\*        Plaintiff needs to include periods of walking around during an 8-hour work day and must walk every 10 minutes for at least 5 minutes.

\*        Plaintiff needs a job that permits shifting positions at will from sitting, standing or walking every hour, and resting for about a half an hour before returning to work.

\*        Plaintiff can occasionally lift/carry 10 pounds, but never more.

\*        Plaintiff can occasionally hold his head in static position, but can rarely look down, turn his head right/left, or look up.

\*        Plaintiff can occasionally climb stairs; can rarely twist and bend; and can never crouch/squat or climb ladders.

\*        Plaintiff has significant limitations in reaching, handling or fingering; can never grasp, turn or twist objects with his hands; can never do fine manipulations with his fingers; and can only reach overhead 10% of an 8 hour work day.

\*        Plaintiff will likely be absent from work more than four days per month.

\*        Plaintiff should avoid stress producing-situations; need prompt access to bathrooms; should avoid unprotected heights; and should avoid temperature extremes due to increased pain and dehydration.

[R. 662–66.]

On September 9, 2014, Plaintiff returned to Dr. Baratta on follow up reporting that he had seen a psychiatrist who recommended titrating Paxil a little higher to deal with his underlying depression.  [R. 668.] Plaintiff reported having good and bad days, that he still feels depressed at times, and that his motivation has decreased.  [*Id.*] He reported having bowel movements 4–10 times a day, and that, when he does have a flare up of colitis, it can last from 2–10 days.  [*Id.*]  He reported having 8 loose bowel movements with some cramping, but no bleeding.  [*Id.*]  Dr. Baratta noted that his anxiety/depresson/ADHD could

benefit from adjustments to his meds; and that his ulcerative colitis and ankylosing spondylitis still resulted in mild bouts but no severe recent illness. [*Id.*]

On September 17, 2014, Dr. Baratta wrote a letter to Plaintiff's counsel to provide clarification related to Plaintiff's health and noting that it was her medical opinion that, as of June 2010, given the nature and severity of Plaintiff's ankylosing spondylitis and ulcerative colitis, that it was physically impossible for Plaintiff to perform any of the activities, as outlined in her July 23, 2014, questionnaire, for 8 hours a day, 5 days a week, for 50 weeks a year.[8] [R. 669.] Dr. Baratta opined that, while Plaintiff's condition may be stable between bouts, and can be controlled to some degree with diet and medical therapy, his condition will most likely slowly deteriorate due to the progressive nature of this autoimmune process that causes chronic inflammation in his GI and musculoskeletal systems. [*Id.*]

**Treating Physician Opinion, Plaintiff's Credibility, and the RFC Determination**

Plaintiff contends the ALJ's decision is in error because, in determining Plaintiff's RFC, the ALJ improperly assessed Dr. Baratta's opinions regarding Plaintiff's physical limitations and dismissed her specific restrictions without providing good reasons. Plaintiff also contends the ALJ failed to properly discuss his credibility, simply disregarding his statements about the intensity and persistence of pain and other symptoms that affect his ability to work. Lastly, Plaintiff argues the ALJ failed to explain how the RFC accounts for all of his limitations, including his ulcerative colitis and ankylosing spondylitis and

---

[8]Plaintiff asserts that the ALJ's decision improperly omitted any discussion of this letter. [Doc. 16.] The Commissioner contends that this letter was first submitted as evidence to the Appeals Council. [Doc. 17.]

associated symptoms.  The Court agrees with Plaintiff.

### ALJ's RFC, Treating Physician, and Credibility Analyses

In determining Plaintiff's RFC, the ALJ followed a two-step process in which he first determined whether there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms.  [R. 20–22.]  The ALJ noted as follows:

> At his hearing, the claimant testified to the following statements. He has spondylosis and ulcerative colitis, which interfered with his ability to work.  He has to use the bathroom frequently and has abdominal pain.  He was having to use the bathroom 17 times a day.  Due to the colitis, he was unable to take medication for his spondylosis.  He lives with his mother. His last job was a production procurement worker with Sony. He would determine what a movie would need and managed the budget, delivery schedule, and vendor contracts. He spent 40 percent of the time standing and walking around. The rest was at a desk. He did very little lifting.  Prior to that, he had a similar job at Caramount. He began having aches/pains and trouble  sleeping. He was diagnosed with inflammation of the spine and joints. He was eventually placed in a rehab program to learn how to function with disability. His condition is progressive and gets worse as time goes on. The colitis developed in 2010. He has been hospitalized six or seven times since then. It is a constant cycle of diarrhea and bloody diarrhea. On a bad day, he is not able to function. On those days, he is in the restroom a lot with a high pain level.  He has these days a couple of times a week. On average, he might use the bathroom 17 times on bad days. He never knows when he is going to have a bad day. He watches his diet and what he eats, but still has them. He has resulting dehydration and drinks a lot of water. He is not taking pain medication for his back due to his colitis. The pain radiates from his neck to his spine, knees, feet, hands, and shoulders. He has pain and weakness in his hands.  He cannot open a bottle of water and cannot grasp. If he is feeling well, he tries to walk a block. During the day, he watches some television and lies down. He can stand for 10 to 15 minutes before he has to sit. He can sit for a couple of hours before he gets stiff in his hips. He can  lift one to two pounds with one hand or 10 with both. He walked

>> from the parking lot to the hearing room today[], which was 70
>> yards.

[R. 21.]

After determining the presence of an impairment or impairments at Step 1, the ALJ,

at Step 2, evaluated the intensity, persistence, and limiting effects of Plaintiff's symptoms

to determine the extent to which they limit Plaintiff's functioning.  [R. 22.] The ALJ stated

that Plaintiff's statements concerning the intensity, persistence and limiting effects of his

symptoms were "not entirely credible for the reasons explained in this decision." [*Id*.]  The

ALJ's evaluation determined that

>> In terms of the claimant's colitis and anakylosing spondylitis,
>> his treatment notes suggest that his symptoms were generally
>> stable after his hospitalization in October 2010 through August
>> 2013. (Exhibits 7F3; 8F1-3; 13F1-2, 4-6).  As of July 2012, he
>> reported sleeping, concentrating, and focusing better and had
>> no significant joint swelling on physical examination. (Exhibit
>> 13F1-2).
>>
>> In August 2013, he had a flare of abdominal pain. However,
>> these symptoms were determined to be associated with
>> gallstones rather than the claimant's preexisting colitis.
>> (Exhibits 19F10; 20F).   He underwent a laparoscopic
>> cholesectomy at that time, after which he reportedly did "well."
>> (Exhibit 20F9; 21F1; 23F14).  Overall, he reported that his
>> bowel movements returned to normal, that he had resumed
>> regular activity without difficulties, and was pain free in his
>> abdomen by September 2013. (Exhibit 21F1; 23F14).  Another
>> small stone was removed in January 2014, after which he
>> again did well. (Exhibit 22F1).
>>
>> Overall, the claimant's treatment notes to which the
>> undersigned has given significant weight, support a finding that
>> he can perform a range of light work. Specifically, light work
>> requires lifting 20 pounds occasionally and 10 pounds
>> frequently.
>>
>> The undersigned has given little weight to the opinion of the
>> claimant's treating physician Dr. Pasquale Barata, who

> submitted a medical source statements on the claimant's behalf in May 2013 and July 2014. Said statements suggest that the claimant can perform less than the full range of sedentary work, which is a more restrictive residual functional capacity than stated above. (Exhibit 17F7; 24F). However, the ultimate issue of disability is reserved for the Commissioner. SSR 96-5p. In this case, the undersigned has considered Dr. Barata's opinion, but it is not consistent with his own treatment notes regarding the claimant, much less the objective medical evidence as a whole.

[R. 22.]

In determining Plaintiff's ability to do work in the national economy, the ALJ asked the vocational expert ("VE") whether someone with significant non-exertional impairments related to ulcerative colitis and ankylosing spondylitis, and limitations requiring frequent climbing, balancing, stooping, kneeling, crouching, and crawling, avoiding exposure to cold and heat, could still work. [R. 87.]  The VE responded in the affirmative. [R. 88.]

When examined by Plaintiff's counsel who modified the hypothetical to include the need to use the restroom 8–10 times a day for up to 15 minutes each time, the VE testified that this would be considered excessive and would not be consistent with gainful employment at any skill or exertional level. [R. 89.]  Counsel for Plaintiff also asked whether a person with a modified hypothetical to include less than approximately ten percent use of his hands for both fine and gross manipulation could perform work. [*Id.*] The VE responded that such limitations would not be consistent with gainful employment. [R. 90.]  The VE also clarified that whenever, for whatever reason, a person is off task for 10 minutes an hour, that is not consistent with gainful employment. [*Id.*]

### Discussion

The Administration has provided a definition of RFC and explained what a RFC

assessment accomplishes:

> RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work related physical and mental activities. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule....

SSR 96–8p, 61 Fed.Reg. 34,474–01, at 34,475 (July 2, 1996) (internal citation and footnotes omitted). The RFC assessment must first identify the claimant's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. 404.1545 and 416.945. *See id.* Only after this identification and assessment may RFC be expressed in terms of the exertional levels of work: sedentary, light, medium, heavy, and very heavy. *Id.* Additionally, the Administration has determined that in assessing RFC, the ALJ

> must consider only limitations and restrictions attributable to medically determinable impairments. It is incorrect to find that [a claimant] has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain, due to factors such as age or height, or whether the [claimant] had ever engaged in certain activities in his or her past relevant work (e.g., lifting heavy weights.) Age and body habitus (i .e., natural body build, physique, constitution, size, and weight, insofar as they are unrelated to the [claimant]'s medically determinable impairment(s) and related symptoms) are not factors in assessing RFC....

*Id*. at 34,476.

34

To assess a claimant's RFC, the ALJ must consider all relevant evidence in the record, including medical history, medical signs, laboratory findings, lay evidence, and medical source statements. *Id*. at 34,477. SSR 96–8p specifically states, "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id*. at 34,478. And, an ALJ's RFC assessment will necessarily entail assessing the credibility of any alleged limitations, including assessing the credibility of testimony offered by the claimant.

In the instant case, while developing the RFC, the ALJ apparently did not find credible Plaintiff's testimony regarding his need to use the restroom multiple times a day. Plaintiff testified that he had bad days about two times a week and that, on his bad days, he could use the bathroom up to 17 times at 5-to-40 minutes per visit. [R. 68.] On a good day, Plaintiff testified he could use the bathroom 8-to-10 times during daytime hours. [R. 69.] The ALJ, however, never explained his consideration of Plaintiff's testimony or Dr. Baratta's report that Plaintiff was still having several episodes of loose bowel movements during his visit in June 2013, requiring him to run to bathroom frequently, or her notation that Plaintiff was stable *between mild bouts* which were controlled, to some degree, with diet and medical therapy.

The law is clear that an ALJ's decision regarding a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p, 1996 WL 374186 at *1. The Ruling states:

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96–7p, 1996 WL 374186 at *2; *see also Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir.1985) (stating that credibility determinations "should refer specifically to the evidence informing the ALJ's conclusion"); *Hatcher v. Secretary*, 898 F.2d 21, 23 (4th Cir.1989) (quoting *Hammond* ).

The ALJ failed to meet this burden because he failed to address Plaintiff's testimony regarding the frequency of his bouts with colitis, and Dr. Baratta's opinion regarding the effects of these bouts of colitis on his ability to work. While the ALJ noted that Plaintiff's colitis was generally stable after his hospitalization in October 2010 through August 2013, the ALJ's opinion does not explain his consideration of evidence of record indicating Plaintiff had numerous "bouts with colitis" after August 2013. [*See, e.g.*, R. 629, 646, 649.] Because the ALJ's decision fails to address his consideration of any limitations associated with Plaintiff's "bouts with colitis," Plaintiff's alleged need to be near a bathroom during the work day, and/or the effect of this limitation on his ability to work, the Court is unable to determine whether the RFC sufficiently addressed this limitation and is, thus, supported by substantial evidence.

Additionally, while the ALJ gave little weight to Dr. Baratta's May 2013 and July 2014 opinions by finding his opinions to be inconsistent with his own treatment notes and

objective medical evidence as a whole, and to be directed to the ultimate issue of disability, the fact that Dr. Baratta was a treating physician dictates more thoughtful consideration by the ALJ. Dr. Baratta's lengthy opinions were directed to, not only Plaintiff's limitations associated with ulcerative colitis and ankylosing spondylitis, but also limitations associated with pain, his need to shift positions, the effect of his pain symptoms on his ability to concentrate, and his inability to tolerate even low stress jobs due to pain and anxiety. The ALJ disregarded these opinions in one sentence.

A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 416.927. *See Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (The ALJ is obligated to evaluate and weigh medical opinions "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist."). There is no indication in the ALJ's decision that the ALJ provided such deference to Dr. Baratta's opinion or sufficiently weighed it.

Based on the above, the Court cannot determine if there was substantial evidence to support the ALJ's decision regarding the opinions of Dr. Baratta, or whether the ALJ's opinion was based on an improper analysis of the treating physician's opinions. Once the ALJ conducts a proper analysis with respect to Dr. Baratta's opinions, as well as any other opinion evidence of record, the should reassess Plaintiff's credibility and RFC so that this

Court can conduct a proper review.

**Remaining Allegations of Error**

Upon remand, the ALJ is to take into consideration Plaintiff's remaining allegations of error. Also, the ALJ must sufficiently consider Dr. Baratta's September 17, 2014, medical opinion letter.[9]

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the Court recommends the Commissioner's decision be REVERSED pursuant to sentence four of 42 U.S.C. § 405(g), and the case is REMANDED to the Commissioner for further administrative action consistent with this Report and Recommendation.

**IT IS SO RECOMMENDED**.

March 16, 2017                          s/Jacquelyn D. Austin
Greenville, South Carolina          United States Magistrate Judge

---

[9]While it is not entirely clear, it appears that Dr. Baratta's September 17, 2014, medical opinion letter was first presented to the Commissioner at the Appeals Council stage. [R. 5.] Plaintiff's counsel likely mistakenly asserted that the ALJ had failed to discuss the September 17, 2014, letter, because it appears that the ALJ may not have known about it. A reply brief by Plaintiff could have helped to clarify this matter. Regardless, on remand, the ALJ can and should consider this evidence.